867 A.2d 1095

Michael ROARY

v.

STATE of Maryland.

No. 25, Sept. Term, 2004.

Court of Appeals of Maryland.

Feb. 11, 2005.

218

Michael R. Braudes, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellant.

Sarah Page Pritzlaff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

On August 1, 2003, Michael Roary ("Roary") was convicted of second-degree felony-murder with first-degree assault as the underlying felony, involuntary manslaughter, first and second-degree assault, conspiracy, and transporting a handgun in a vehicle. His conviction is based upon the events of December 27, 2001, in which Roary and three friends chased the victim, Charles Banks, III, and then tripped, kicked, and dropped a boulder on his head twice.[1] Mr. Banks died ten months later as a result of injuries sustained during the beating.

Roary presents the following questions for our review:

1. Did the trial court err in ruling that first-degree assault is a viable underlying felony for common-law second-degree felony-murder, and in submitting that count to the jury?

2. Did the trial court err in its instructions to the jury?

3. Did the trial court consider impermissible criteria in imposing sentence?

We hold that first-degree assault is a proper underlying felony to support a second-degree felony-murder conviction. The assault for which Roary was found to have committed qualifies as a "dangerous to human life" felony pursuant to our holding in *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001), and, therefore, we decline to modify the common law of this State to adopt the so-called "merger" doctrine. Further, we hold that the trial court neither erred in its instructions to the jury nor considered impermissible criteria in imposing sentence.

## I.

On December 27, 2001, Roary, his cousin Charles Peters, a.k.a. "Man," and a friend, Charles Lucas, a.k.a. "Bootsey,"

---

1. The victim's name appears in the record as both "Bank" and "Banks."

were standing on a corner in Baltimore City when Bootsey mistakenly identified Mr. Banks as someone who recently robbed him. Bootsey said he was going to get a gun and Man said he would "handle" it. When the victim left his mother's house across the street, Man chased him around a car, firing several shots at him. Mr. Banks fled with the three men chasing him.

The fourth co-conspirator, Randolph Sheppard, a.k.a. "Ink," was standing nearby on Smithson Street in an area known as "the bricks." In response to a cry to stop Mr. Banks, Ink tripped and began kicking and punching Mr. Banks.[2] Once they arrived at "the bricks," Man, Bootsey, and Roary joined in the beating. At one point during the altercation, two of Roary's co-conspirators dropped a two and one-half foot wide and 20–30 pound boulder on Mr. Banks's head.[3] According to Roary's first statement to police, Man produced the boulder "out of no where" and said to "watch out [sic] clear it out and then [he] mashed his head with the brick." In a subsequent statement to police, Roary added that after Man dropped the boulder on Mr. Banks's head, Bootsey picked it up and dropped it on him a second time. Although Roary identified Man and Bootsey as the two who dropped the boulder on Mr. Banks's head, an eye witness testified that it was Ink, not Bootsey, who actually dropped the boulder. Based on the briefs and trial transcript, the State appears to have adopted the witness's account of who dropped the boulder. It is undisputed, however, that Roary's participation in the actual beating was limited to kicking Mr. Banks in the leg.

Following the attack, Roary and Bootsey recovered the gun used by Man while he was chasing the victim around the car.

---

2. In a taped statement with the police, Roary stated that it was Man who yelled for Ink to "grab him." Another witness, however, testified at trial that it was Roary who called to Ink.

3. Throughout the record the boulder is referred to as a "brick." Based on pictures of the object in evidence, however, it is clear the term "brick" does not fully describe the object dropped on Mr. Banks's head. We, therefore, adopt the more accurate description of "boulder" for the object.

After recovering the weapon, Roary and Bootsey were picked up in a car by the other two co-defendants and attempted to leave the area. A police chase ensued, and all of the participants were subsequently apprehended.

Ink and Man entered guilty pleas to second-degree murder and conspiracy to commit first-degree assault. They received 25 years with all but 15 years suspended. Bootsey's trial was scheduled to begin after Roary's.[4] Prior to Roary's trial there were discussions between the State and Roary regarding his testifying against his co-conspirators. When Roary learned that he would have to testify in open court, he refused to do so.

A Baltimore City jury found Roary guilty of second-degree felony-murder in the course of a first-degree assault, involuntary manslaughter, first and second-degree assault, conspiracy, and transporting a handgun in a vehicle. The jury acquitted Roary of "intent to kill" second-degree murder and transporting a handgun on his person.[5] Roary was sentenced to 30 years on the second-degree felony-murder charge, five years consecutive on the conspiracy charge, and three years concurrent on the handgun offense.

Roary filed a timely appeal in the Court of Special Appeals, however, we granted *certiorari* on our own motion before consideration of the matter in that court. *Roary v. State*, 381 Md. 674, 851 A.2d 593 (2004).

## II.

Roary's primary argument on appeal relates to his conviction for second-degree felony-murder. He argues that,

[f]irst-degree assault, on a theory of intent to inflict serious physical injury under § 3–202 of the Crim. Law Art., which is part and parcel of any intentional homicide, is not an

---

4. The record does not reflect the outcome of Bootsey's trial.

5. Before consideration of the charges by the jury, the trial court granted a motion for judgment of acquittal regarding the first degree murder count.

underlying felony which sustains a conviction for common law second-degree felony murder. Accordingly, this theory of criminal homicide should not have been submitted to the jury, and the resulting conviction must be reversed.

He relies on cases from other jurisdictions which have adopted the so-called "merger" doctrine and urges this Court to do the same. For the reasons expressed herein, we decline to do so.

## A. Preservation

■ Before consideration of this matter on the merits, we first address the issue of preservation. The State argues that Roary failed to preserve the issue of whether first degree assault is a proper underlying felony for a second-degree felony-murder conviction by failing to object to the issue below. The State notes that Roary's counsel approved both the felony-murder jury instruction and verdict sheet. The State further argues that when they informed the defense and the court that it had prepared a verdict sheet that included a second-degree felony-murder instruction based on *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001), the defense did not object. Roary concedes that "at trial, the point was not made quite so clearly," but contends that at the motion for a new trial hearing, defense counsel "squarely argued that first degree assault is not a proper underlying felony."

■ Based on our review of the trial transcript, we conclude that Roary failed to properly raise the issue of whether first-degree assault is a proper underlying felony for a second-degree felony-murder conviction. Furthermore, we are unable to determine if the issue was "squarely" raised at the hearing on the motion for a new trial because the transcript of the hearing was not included in the record. Nevertheless, we choose to exercise our discretion to consider the issue on appeal.

Md. Rule 8–131(a) provides that an appellate court will ordinarily not decide any issue unless it was raised in or decided by the trial court. We may, however, "decide such an issue if necessary or desirable to guide the trial court or to

avoid the expense and delay of another appeal." Md. Rule 8–131(a). In *Fisher*, we exercised our discretion to consider the unpreserved issue of whether child abuse is a proper underlying felony to support a conviction for second-degree felony-murder. *Fisher*, 367 Md. at 225, 786 A.2d at 710. Although the issue was not raised at trial, we acknowledged that "a sentence imposed under an entirely inapplicable statute 'is an illegal sentence which may be challenged at any time.'" *Fisher*, 367 Md. at 239–40, 786 A.2d at 719 (quoting *Moosavi v. State*, 355 Md. 651, 662, 736 A.2d 285, 291 (1999)). We concluded that,

> if the felony murder doctrine has no application to a homicide resulting from child abuse, then the thirty year sentence for murder in the second degree imposed on the petitioners would be similarly illegal, because, by the special verdict, the findings of guilty of murder were based solely on felony murder.

*Fisher*, 367 Md. at 240, 786 A.2d at 719. The same rationale applies to the case at bar. If first-degree assault is not a proper underlying felony for a second-degree felony-murder conviction, then Roary's sentence of thirty years would likewise be illegal because the sole basis for the second-degree murder conviction was felony-murder, as the jury acquitted Roary of second-degree intent-to-kill murder.

Moreover, if the sentence for second-degree felony-murder constitutes an illegal sentence, Roary could raise that issue on a motion for reconsideration or on a petition for post conviction relief. In either scenario, if Roary did not prevail the case would be subject to an application for appellate review. In the interest of avoiding the expense and delay of another appeal we invoke our jurisdiction to resolve the issue.

## B. Felony–Murder

"At common law one whose conduct brought about an unintended death in the commission or attempted commission of a felony was guilty of murder." Wayne R. LaFave, *Substantive Criminal Law* § 14.5 (2nd ed. 2003). The modern felony-murder rule is "intended to deter dangerous con-

duct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill." *Fisher,* 367 Md. at 262, 786 A.2d at 732. The doctrine recognizes that in society's judgment, "an intentionally committed [felony] that causes the death of a human being is qualitatively more serious than an identical [felony] that does not." Crump & Crump, *In Defense of the Felony Murder Doctrine,* 8 Harv. J.L. & Pub. Pol'y 359, 363 (1985).

■■■ In *Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979), we stated:

> At common law, to which the inhabitants of Maryland are entitled, Md. Const. Declaration of Rights, Art. 5, homicide is the killing of a human being by another human being; criminal homicide is homicide without lawful justification or excuse; criminal homicide with malice aforethought is murder; malice aforethought is established, *inter alia,* upon commission of criminal homicide in the perpetration of, or in the attempt to perpetrate, a felony. Thus at common law, homicide arising in the perpetration of, or in the attempt to perpetrate, a felony is murder whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to supply the element of malice.

*Jackson,* 286 Md. at 435, 408 A.2d at 714–15 (internal footnotes and citations omitted). *See also Campbell v. State,* 293 Md. 438, 441–42, 444 A.2d 1034, 1036–37 (1982) (quoting *Jackson* with approval). To obtain a conviction for felony-murder, the State is required to prove the underlying felony and that the death occurred during the perpetration of the felony. *Newton v. State,* 280 Md. 260, 269, 373 A.2d 262, 267 (1977). "Without proof of the underlying felony, there can be no conviction for felony murder." *Hook v. State,* 315 Md. 25, 32, 553 A.2d 233, 236 (1989).

The seminal case in Maryland regarding common law second-degree felony-murder is *Fisher v. State,* 367 Md. 218, 786 A.2d 706. *Fisher* involved the death of a nine-year-old girl by

dehydration and malnutrition as a result of child abuse. Two of the three defendants in *Fisher* were convicted of second-degree felony-murder with child abuse as the underlying felony. We accepted *certiorari* to answer the question of whether Maryland law recognizes the common law doctrine of felony-murder in homicides committed in the perpetration of a felony other than the ones enumerated in the first-degree murder statutes.[6] *Fisher,* 367 Md. at 225, 786 A.2d at 710. We answered the question in the affirmative, holding that "child abuse of the character and degree described in the evidence of this case is inherently dangerous. Accordingly, the circuit court did not err in submitting to the jury second degree felony murder based upon child abuse." *Fisher,* 367 Md. at 263, 786 A.2d at 733. *See also, Deese v. State,* 367 Md. 293, 296, 786 A.2d 751, 752 (2001) (Affirming second-degree felony-murder conviction based on the felony of child abuse and noting that the Court in *Fisher* "held that felony murder in the second degree, predicated on child abuse, or on any other inherently dangerous felony not enumerated in the first degree murder statutes, is a cognizable offense under the common law of this State.").

The Court in *Fisher* began by recognizing that the felonies identified by the first-degree murder statute are not the exclusive felonies that may be a predicate for felony-murder. *Fisher,* 367 Md. at 251, 786 A.2d at 726.[7] Next, the

---

6. At the time relevant to *Fisher*, the first-degree murder statute was codified at Md.Code (1957, 1996 Repl. Vol.), Art. 27 §§ 408 through 410. It is now found at Md.Code (2002) § 2–201(a) of the Criminal Law Article.

7. The enumerated felonies in the first-degree murder statute are: (i) arson in the first degree; (ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that: (1) is not parcel to a dwelling; and (2) contains cattle, goods, wares, merchandise, horses, grains, hay, or tobacco; (iii) burglary in the first, second, or third degree; (iv) carjacking or armed carjacking; (v) escape in the first degree from a State correctional facility or a local correctional facility; (vi) kidnapping under § 3–502 or § 3–503(a)(2) of this articles; (vii) mayhem; (viii) rape; (ix) robbery under § 3–402 or § 3–403 of this article; (x) sexual offense in the first or second degree; (xi) sodomy; or (xii) a

Court concluded that the felonies that would support a conviction for common law second-degree felony-murder are not limited to those felonies that existed at common law. *Fisher,* 367 Md. at 253–54, 786 A.2d at 727. Lastly, we concluded that the underlying felony must be sufficiently dangerous to life to justify application of the doctrine and "that the danger to life of a residual felony is determined by the nature of the crime *or* by the manner in which it was perpetrated in a given set of circumstances." *Fisher,* 367 Md. at 263, 786 A.2d at 733. "If the felonious conduct, under all of the circumstances, made death a foreseeable consequence, it is reasonable for the law to infer from the commission of the felony under those circumstances the malice that qualifies the homicide as murder." *Fisher,* 367 Md. at 262, 786 A.2d at 732.[8]

We have repeatedly held that "under the felony-murder doctrine a participating felon is guilty of murder when a homicide has been committed by a co-felon." *Campbell,* 293 Md. at 442, 444 A.2d at 1037 (citing *Stevens v. State,* 232 Md. 33, 41, 192 A.2d 73, 78, *cert. denied,* 375 U.S. 886, 84 S.Ct. 160, 11 L.Ed.2d 115 (1963); *Boblit v. State,* 220 Md. 454, 457, 154 A.2d 434, 435 (1959); *Brady v. State,* 222 Md. 442, 160 A.2d 912 (1960); *Shockley v. State,* 218 Md. 491, 497, 148 A.2d 371, 374 (1959)). *Campbell* involved the question of whether a co-felon could be held criminally liable for the death of a fleeing co-felon caused by a police officer or the felony victim. We held that, "ordinarily, under the felony-murder doctrine, criminal culpability shall continue to be imposed for all lethal acts committed by a felon or an accomplice acting in furtherance of a common design. However, criminal culpability ordinarily shall not be imposed for lethal acts of nonfelons that are not

violation of § 4–503 of the Criminal Law Article concerning destructive devices. Md.Code (2002), § 2–201(a)(4) of the Criminal Law Article.

8. In Maryland, the three circumstances when we will imply malice are (1) an intent-to-do-serious-bodily-injury murder; (2) depraved-heart murder; and (3) felony-murder. *Evans v. State,* 28 Md.App. 640, 696, 349 A.2d 300, 335 (1975).

committed in furtherance of a common design." *Campbell*, 293 Md. at 451–52, 444 A.2d at 1042.

In the present case, the underlying felony is first-degree assault. Section 3–202(a)(1) of the Maryland Code defines the crime of first-degree assault. It provides, in relevant part, that "[a] person may not intentionally cause or attempt to cause serious physical injury to another." Md.Code (2002) § 3–202(a)(1) of the Criminal Law Article.[9] "Serious physical injury" is physical injury that: "(1) creates a substantial risk of death; or (2) causes permanent or protracted serious: (i) disfigurement; (ii) loss of the function of any bodily member or organ; or (iii) impairment of the function of any bodily member or organ." Md.Code (2002) § 3–201(c).[10]

■ Applying the *Fisher* standard to the case at bar, first-degree assault would support a common law second-degree felony-murder conviction if the nature of the crime itself or the manner in which it was perpetrated was dangerous to human life. We do not hesitate to hold that first-degree assault is dangerous to human life. The nature of the crime committed, a crime which "creates a substantial risk of death," is undoubtedly dangerous to human life. Furthermore, the manner in which the crime was committed in this instance, an assault by four men that included dropping a 20–30 pound boulder repeatedly on the victim's head, is also clearly dangerous to human life. Based on the standard we enunciated in *Fisher* and reaffirmed in *Deese*, first-degree assault is a proper underlying felony to support a second-degree felony-murder conviction.[11]

---

**9.** Assault in the first degree also prohibits a person from committing an assault with a firearm. Md.Code (2002) § 3–202(a)(2) of the Criminal Law Article.

**10.** Assault in the first degree is included as a "crime of violence" in the Mandatory Sentences for Crimes of Violence statute, Md.Code (2002), § 14–101(a)(16). *See* other crimes listed therein which constitute crimes of violence by definition.

**11.** One commentator has suggested:

Maryland is unique in that, our "common law basis for felony murder ... distinguishes our jurisprudence from that of states that have adopted a criminal code in lieu of the common law crimes." *Fisher,* 367 Md. at 251 n. 10, 786 A.2d at 726 n. 10. As recently as 2001, we reiterated the fact that in Maryland, " 'the felony-murder doctrine is the common law rule—defining one of at-least three varieties of implied malice—which raises a homicide resulting from the perpetration or attempted perpetration of a felony to the murder level generally.' " *Fisher,* 367 Md. at 250–51, 786 A.2d at 725 (quoting with approval *Evans v. State,* 28 Md.App. 640, 686 n. 23, 349 A.2d 300, 329–30 n. 23 (1975)). Judge Rodowsky, writing for the Court in *Fisher,* noted that "the common law of felony murder has changed since colonial times, but, in Maryland, it has done so as a matter of common law evolution and not as a result of [legislation]." [12] *Fisher,* 367 Md. at 249, 786 A.2d at 724. The harshness of the rule has been ameliorated by limiting its application to those felonies that are dangerous to human life either because of their inherent nature or by the manner in which the felony is perpetrated; however, the basic

---

> Even accepting some amelioration of the common law doctrine, however, it is clear that there are some felonies in Maryland, not included in the first-degree penalty scheme, which nonetheless involve potential violence and significant threat to life and limb. Should death result from the perpetration or attempted perpetration of any of them, it seems clear that such homicide would be second-degree murder in Maryland by virtue of the common law felony-murder doctrine. That category of crime almost certainly would include such dangerous felonies as the forcible abduction of a child under 12 years of age ...; *first-degree assault* ...; causing abuse to a child ...; dynamiting property ...; using a machine gun to perpetuate a crime of violence ...; poisoning the water supply ...; derailing a railroad car ...; an act of sabotage ...; or perhaps the sale or distribution of a narcotic drug where the user dies of an overdose, from a bad batch, or from an unexpectedly lethal batch.

Judge Charles E. Moylan, Jr., Criminal Homicide Law § 5.1, 108-109 (MICPEL 2002)(emphasis added).

12. Our case law recognizes that the changes resulting from Chapter 128 of the Acts of 1809, which delineated murder into degrees for the purpose of punishment, did not alter the common law felony-murder doctrine. *See Fisher,* 367 Md. at 248-49, 786 A.2d at 724-25 and cases cited therein.

rule still applies: a criminal homicide committed in the perpetration of or in the attempted perpetration of a dangerous to life felony will supply the element of malice necessary to raise the homicide to the level of murder in this State.

Roary, however, urges this Court to adopt the position taken by a number of other state courts which do not permit assault to be an underlying felony in a felony-murder conviction.[13] The position is commonly referred to as either the "merger" doctrine or the "collateral-felony" doctrine.[14] *See Missouri v. Williams,* 24 S.W.3d 101, 114–15 (Mo.Ct.App. 2000).

In *California v. Hansen,* 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (1994), the Supreme Court of California summarized the doctrine:

---

**13.** *See Barnett v. Alabama,* 783 So.2d 927 (Ala.Crim.App.2000) (holding that felonious assault merges with the homicide); *Arizona v. Essman,* 98 Ariz. 228, 403 P.2d 540 (1965) (holding that assault with a deadly weapon merged with resulting homicide); *Illinois v. Morgan,* 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206 (1999) (holding that the conduct constituting the felony must have a felonious purpose other than killing itself); *Kansas v. Fisher,* 120 Kan. 226, 243 P. 291 (1926) (holding that the elements of the felony must be distinct from the homicide); *Massachusetts v. Wade,* 428 Mass. 147, 697 N.E.2d 541 (1998) (holding that the felony must be independent of the homicide); *New York v. Wagner,* 245 N.Y. 143, 156 N.E. 644 (1927) (holding that the underlying felony must be an independent crime); *Tarter v. Oklahoma,* 359 P.2d 596 (Okla.Crim.App.1961) (holding that the felony must be an independent crime not included in the homicide); *Oregon v. Branch,* 244 Or. 97, 415 P.2d 766 (1966) (holding that assault is not a proper underlying felony for felony-murder conviction).

**14.** The merger doctrine referred to here is not to be confused with Maryland merger law and the required evidence test for determining when a lesser included offense or, in the case of felony-murder, the underlying felony would merge into the greater offense for sentencing purposes. *See Newton,* 280 Md. at 268, 373 A.2d at 266 ("Thus under both federal double jeopardy principles and Maryland merger law, the test for determining the identity of offenses is the required evidence test. If each required proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same and separate sentences for each offense are prohibited.").

Prior to our decision in [*California v. Ireland,* 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969)], the "merger" doctrine had been developed in other jurisdictions as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or "predicate") felony committed by the defendant was *assault.* The name of the doctrine derived from the characterization of the assault as an offense that "merged" with the resulting homicide. In explaining the basis for the merger doctrine, courts and legal commentators reasoned that, because a homicide generally results from the commission of an assault, every felonious assault ending in death automatically would be elevated to murder in the event a felonious assault could serve as the predicate felony for purposes of the felony-murder doctrine. Consequently, application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefor punishable as manslaughter). One commentator explains that the merger rule applied to assaults is supported by the policy of preserving some meaningful domain in which the Legislature's careful gradation of homicide offenses can be implemented.

*Hansen,* 885 P.2d at 1028 (internal citations omitted). Citing *Hansen,* the Supreme Court of Tennessee has noted that the merger doctrine has been interpreted by courts as a principle for discerning legislative intent. *Tennessee v. Godsey,* 60 S.W.3d 759, 774 (Tenn.2001).[15]

---

**15.** *Ireland,* 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969), the case often cited by courts in adopting the merger doctrine, involved the

In *Missouri v. Williams*, 24 S.W.3d 101, the intermediate appellate court of Missouri succinctly summarized the logic used by the various jurisdictions that have adopted the merger doctrine:

As stated in [*Kansas v. Lucas*, 243 Kan. 462, 759 P.2d 90, 93 (1988)], the purpose of the [felony murder] statute is to deter those engaged in felonies from killing negligently or accidentally[,] and that doctrine should not be extended beyond its rational function which it was designed to serve. Second is the recognition of the fact that, as a practical matter, the vast majority of homicides have their genesis in some type of felonious assault. Given these propositions, various reasons have been given for the doctrine: (1) the application of the felony murder rule would work to eliminate the *mens rea* requirement for most homicide cases and circumvent the legislative gradation system for classes of homicides, including manslaughter. If felonious assault could ... be used as the predicate felony for felony murder, every felonious assault resulting in death would be murder, and any lesser offense such as voluntary manslaughter, involuntary manslaughter, and criminally negligent homicide would effectively be eliminated. The result would be that the prosecution would not have to prove that the defendant had a specific intent to kill in most murder cases, and (2) the rationale of the merger doctrine is consistent

---

killing at close range of a wife by her husband. The court in *Ireland* concluded:

the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule "beyond any rational function that it is designed to serve." To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in the law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged.

*Ireland*, 75 Cal.Rptr. 188, 450 P.2d at 590 (internal citation omitted).

with the purpose of the felony murder rule. Because homicide is usually the result of an assault, and because a felonious assault involves a risk of death, a felon would not be deterred from committing a dangerous and homicidal act for the reason that the felony itself is the homicidal act sought to be deterred.[16]

*Williams*, 24 S.W.3d at 113–14 (internal citations and quotations omitted).

As *Williams* pointed out, one reason given by courts that have adopted the merger doctrine is the concern that if felonious assault can support a felony-murder conviction then "every felonious assault resulting in death would be murder, and any lesser offense such as voluntary manslaughter, involuntary manslaughter, and criminally negligent homicide would effectively be eliminated." *Williams*, 24 S.W.3d at 114. In response to this concern, Georgia has adopted a modified version of the felony-murder doctrine. It precludes a felony-murder conviction only where it would prevent an otherwise warranted verdict of voluntary manslaughter. *Edge v. Georgia*, 261 Ga. 865, 414 S.E.2d 463, 465 (1992). The court reasoned that "the strict liability element of felony murder, which allows the 'bootsrapping' of an assault charge to support a felony murder conviction, is unfair in those instances where the killings otherwise could have been reduced, on the ground of mitigation, to manslaughter." *Edge*, 414 S.E.2d at 465. Whether Maryland should or needs to adopt a similar modification to the felony-murder rule, however, need not be decided today as the facts of the case do not remotely raise the issue of mitigation.

■ "The acts which constitute felonious conduct [must] possess a sufficient danger to human life to justify the applica-

---

**16.** The court stated that it was "of the opinion that the need for the doctrine is legally well grounded." *Williams*, 24 S.W.3d at 114. Ultimately, however, the court held that based on the language of the Missouri felony-murder statute, the legislature intended for the rule to apply to all felonies, except murder and manslaughter, including assault. *Williams*, 24 S.W.3d at 117.

tion of the felony murder doctrine." *Fisher*, 367 Md. at 257, 786 A.2d at 730 (quoting *Massachusetts v. Matchett*, 386 Mass. 492, 436 N.E.2d 400, 410 (1982)). Here the facts are not in dispute, and they were sufficient for the jury to have found that the assault on the victim was committed under circumstances demonstrating that the participants contemplated that violence was necessary to carry out their common purpose. Thus a reasonable jury could have found beyond a reasonable doubt that Roary's conduct was inherently dangerous.

■ By applying the felony murder doctrine, our focus is on the conduct of the participants in the perpetration or attempted perpetration of the underlying felony. We decline to accept the invitation to limit the scope of the doctrine's application to only those underlying felonies that are independent of the resulting death. Moreover, we are persuaded that the better policy is for the law to provide an additional deterrent to the perpetration of felonies which, by their nature or the attendant circumstances, create a foreseeable risk of death. *Fisher*, 367 Md. at 256, 786 A.2d at 728–29 (internal citation omitted). We reaffirm the principle that a person participating in a felony is responsible for the natural and probable consequences of his or her criminal activity.

We hold, that an assault in the first degree, when committed in a manner inherently dangerous to human life, as in this case, may be a predicate felony for second-degree felony-murder. Thus the trial court did not err in submitting to the jury second-degree felony-murder based upon an assault in the first degree. We recognize that our relatively strict adherence to the common law felony-murder doctrine is not favored by a number of other States as explained *supra*; nothing in our case law or research, however, has persuaded us that the rule in Maryland should be otherwise.

### III. Jury Instructions

■ Md. Rule 4–325 states in relevant part that "[t]he court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supple-

ment them at a later time when appropriate." The decision to give supplemental instructions is within the sound discretion of the trial court and will not be disturbed on appeal, absent a clear abuse of discretion. *See Mitchell v. State,* 338 Md. 536, 540, 659 A.2d 1282, 1284 (1995) (internal citations and quotations omitted). When reviewing a jury instruction we look to the instruction as a whole. *State v. Foster,* 263 Md. 388, 397, 283 A.2d 411, 415 (1971), *cert. denied,* 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). In *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983), we stated "[i]t is well settled that 'when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole.'" *Poole,* 295 Md. at 186, 453 A.2d at 1228 (quoting *Foster,* 263 Md. at 397, 283 A.2d at 415).

Roary's first contention is that the trial court erred in instructing the jury regarding felony-murder. Specifically, Roary argues that if first-degree assault is not a proper underlying felony to support a felony-murder conviction, then it was error to give a felony-murder instruction in this case. For the reasons set forth in the previous section, we find no merit in Roary's first contention.

Roary's remaining objections to the jury instructions include a complaint that, assuming the court was correct in giving the felony-murder instruction, the court erred regarding the substance of the felony-murder instruction given and in its efforts to cure the problems. Roary argues that when the instructions are viewed as a whole, two prejudicial messages emerge: one of confusion and inconsistency and the other of repetition.

With regard to the question of confusion and inconsistency, Roary notes that the instruction regarding the felony-murder count given by the court "could have been understood to mean that felony-murder requires no proof of criminal intent at all."[17] Roary raised this objection with the court and the

17. Roary cites the following passage from the court's instruction:

court re-instructed the jury regarding the intent requirement. Specifically, the court instructed the jury that,

> [t]raditional, shall we say, murder in the second-degree requires as an element an intention to kill. Felony-murder typically would not require an intent to kill because it was the commission of the felony which substituted, so to speak, for the intent to kill. The law said if you committed a murder in the course of a felony, that is murder and we are going to hold you accountable. The difficulty in this case is that the felony in the felony-murder is assault in the first degree.

> I did not want you to misunderstand as you consider that charge, assault in the first degree, that you remember it does require proof of intent, okay. Now, first-degree assault, formally, the Defendant is charged with the crime of first-degree assault. In order to convict the Defendant of first-degree assault, the State must prove all of the elements of second-degree assault and must prove that the Defendant intended to cause—there is that word—serious physical injury in the commission of the assault.

> What does serious physical injury mean? It means an injury that creates a substantial risk of death or causes serious and permanent or serious and protracted disfigurement, impairment, harm to the body.

Having reviewed the transcript, we hold that the trial court did not err regarding the felony-murder instruction. Viewed in context, we find it clear that the court was comparing the various forms of second-degree murder alleged in the case, not implying that felony-murder required no intent.[18] Further-

---

Now what is being said here—I am sorry. A felony murder does not require the State to probe that the Defendant intended to kill the victim. Now there is a big difference, you see? When I talked about second-degree murder, I said it was the killing of another person with either the intent to kill or the intent to inflict serious bodily harm that death would be the likely result and it did not require premeditation or deliberation. Now we are talking about a murder, second-degree murder, which does not require intent.

18. Immediately preceding the quoted instruction above, the trial court gave the jury an instruction on second-degree murder that required the

more, in light of the court's re-instruction quoted above, any confusion in the jury's mind regarding the issue of intent should have been clarified.

Roary further objects to the court informing the jury that first-degree assault constitutes second-degree assault coupled with the use of a weapon. According to Roary, this explanation of first-degree assault was erroneous because the assault here in question was of the "intent to inflict serious physical injury" type and not the "firearm" type. Both Roary and the State immediately informed the court of the error, and the court told the jury that first-degree assault could be proven either by use of a weapon or by offensive touching done with the intent to cause serious physical injury. The court expressly told the jury that it "shouldn't have" given an example of first-degree assault by use of a weapon "because there was no weapon alleged by the State to have been used by the Defendant." Roary expressed his objection regarding the instruction for a second time in a bench conference following the jury instructions but before the jury retired to deliberate. The court obligingly re-instructed the jury that when it previously made reference to a firearm in describing first-degree assault:

> I recited language from that formal statement of the law that read something that made some reference to a firearm.

---

State to prove that the defendant killed another person "with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result." The court then repeated the instruction and explained: "Now if you were to find the Defendant not guilty of that second-degree murder as I have just defined it, you would then turn to second-degree felony-murder." The court continued:

> The Defendant is also charged with the crime of second-degree felony-murder. In order to convict him of that charge, second-degree felony-murder, the State must prove—again, this is always, although I will not always say it—beyond a reasonable doubt and to your unanimous satisfaction that the Defendant or another participating in the crime with the Defendant committed the felony of first-degree assault—and I will come back to that—and that the Defendant or another participating in the crime killed Mr. Banks; and that the act resulting in the death of Mr. Banks occurred during the commission of the felony of first-degree assault.

The section quoted by Roary above then followed.

Well, I did not mean to suggest to you, and I suspect that unanimously you were not confused, because there is no allegation in this case that a firearm was used to commit the crime of murder. But as I was reading the formal law, I did include that element, which is part of it but not in this case.

Assuming, *arguendo,* that the jury was confused regarding the elements of first-degree assault, we hold that by re-instructing the jury as it did, the court cleared up any confusion. Thus, we perceive no error.

Roary's third basis of error with regard to the jury instructions is that by re-instructing the jury regarding felony-murder and second-degree murder in general, the jury could have been left with the impression that "a guilty verdict of second-degree murder was appropriate." Roary points out that the jury was told about second-degree felony-murder three times in the instructions and "intent-to-kill" second-degree murder twice.

The repeated instructions given in the case were given to remove any potential confusion regarding the intent necessary for a felony-murder conviction, an instruction to which counsel for Roary had objected as being unclear. Furthermore, Roary cites no cases in support of the proposition that re-instructing a jury when the initial instruction is objected to as being unclear or incorrect, is error. On the contrary, Roary begins by acknowledging that it is within the sound discretion of the trial court whether to propound supplemental jury instructions. Again, perceiving no error or abuse of discretion in the court's decision to re-instruct the jury, we find no merit in Roary's third argument.

■ Roary's final argument regarding the jury instructions is an objection to the trial court's use of examples in explaining the relevant law. Specifically, Roary objects to the court using the example of an unintentional death resulting to a teller during a bank robbery to illustrate felony-murder, the example of pushing someone down the stairs to illustrate first-degree assault, and the example of a drug organization to

illustrate the concept of conspiracy. Roary cites the case of *Fagan v. State,* 110 Md.App. 228, 676 A.2d 1009 (1996), in support of his position that "use of ad-libbed examples, if prejudicial, merits reversal." He argues that the examples given were "so far afield as to be confusing and misleading."

*Fagan,* however, is inapposite to the present case. The issue in *Fagan* arose when the jury sent a note asking for a clarification regarding the term corroboration. Over objections by both the State and the defense, the court had the jury brought back to the court room and gave them examples of corroboration using specific examples from testimony and evidence in the trial. *Fagan,* 110 Md.App. at 238, 676 A.2d at 1013. The Court of Special Appeals held that, "in providing the jury with specific examples of corroboration from the evidence before it, the trial judge appeared to be favoring testimony of certain witnesses over that of others, and commented on the general weight of the evidence." *Fagan,* 110 Md.App. at 245, 676 A.2d at 1017. The court concluded it was "unable to declare the error harmless." *Id.* In the present case, however, the trial court gave examples of alternative ways in which the crimes charged could be proven. Although we are of the opinion that the jury instructions regarding the law without the examples was sufficient to inform the jury, we find no reversible error in the examples given by the court. All of the examples given were correct statements of the law and caused no harm to the defendant. We hold that the trial court did not err in its instructions to the jury.

## IV. Sentencing

Roary contends that the trial court impermissibly considered the fact that he refused to testify against his co-conspirators in sentencing him in violation of his Fifth Amendment right not to incriminate himself. The State counters that the argument is waived because Roary failed to raise the objection before the sentencing court and, if preserved, the argument is without merit.

Although we find that Roary failed to raise an objection below to the trial court's discussion of Roary's failure to testify

against his co-conspirators, we nevertheless exercise our right to decide the issue. Md. Rule 8–131(a). Based on our review of the record we hold that the trial court did not consider impermissible sentencing criteria in the instant case.

In *Jackson v. State*, 364 Md. 192, 772 A.2d 273 (2001), Judge Cathell, writing for this Court, summarized our standard for reviewing a criminal sentence:

> It is well settled that "[a] judge is vested with very broad discretion in sentencing criminal defendants." However, "[a] judge should fashion a sentence based upon the facts and circumstances of the crime committed and the background of the defendant, including his or her reputation, prior offenses, health, habits, mental and moral propensities, and social background." "The judge is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation." It is also well settled that "[o]nly three grounds for appellate review of a sentence are recognized in this [S]tate: (1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits."

*Jackson*, 364 Md. at 199–200, 772 A.2d at 277 (internal citations omitted). Notwithstanding the Court's broad sentencing discretion, it is equally clear that a trial court may not punish a person because he has done what the law allows him to do, which in this instance is exercise his Fifth Amendment right not to incriminate himself. *See Jennings v. State*, 339 Md. 675, 684, 664 A.2d 903, 908 (1995) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 610 (1978)) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. . . ."); *Johnson v. State*, 274 Md. 536, 542–543, 336 A.2d 113, 117 (1975) ("Thus, in view of what is at stake for one who is charged with a crime, it is improper to conclude that a decision, constitutionally protected, not to plead guilty . . . is a factor which ought to, in any way, influence the

sentencing judge to the detriment of the accused."); *Ridenour v. State*, 142 Md.App. 1, 16, 787 A.2d 815, 824 (2001) ("The sentencing court plainly erred in taking into consideration the appellant's decision to exercise his Fifth Amendment right to remain silent in sentencing him."). Roary was an active participant in the crime in question, and there is no indication the State was offering him immunity for his testimony. Roary not only had a right to go to trial and require the State to prove his guilt beyond a reasonable doubt, but he also had the right to not incriminate himself by testifying to events that implicated him in a very serious crime. It would, therefore, be error on the part of the sentencing judge to consider Roary's refusal to testify against his co-defendants in fashioning an appropriate sentence.

Roary cites the following colloquy that occurred during his allocution to support his argument that the court held his failure to testify in his co-conspirators' trials against him:

THE COURT: Is your client testifying in this other trial?

THE STATE: He is not.

MR. CARDIN: I don't know, I mean, there has never been any discussion. I am not sure the other one—well, I don't know what is going to happen with the other case tomorrow.

THE COURT: So you refused to testify in three cases so far where you know the truth of what took place, according to you anyway. As a consequence of your refusal to testify, two defendants got light sentences and the third defendant is on trial tomorrow. Is that a fair statement or do you think I am wrong?

THE DEFENDANT: I'm saying, I don't—

THE COURT: Right, anything else that you want to say?

MR. CARDIN: I do not think he recognizes it that way. I think it is—

THE COURT: I am sure it is not his perspective.

MR. CARDIN:—a matter of personal safety or whatever. I do not think—

THE COURT: You really do not have a right, as far as I am concerned, not to testify if you are not yourself facing

charges, you understand. You have an obligation to tell the truth. But I am going to get—

THE DEFENDANT: Yes, sir, I told you the truth, sir.

THE COURT: I am not going to dwell on that point.

THE DEFENDANT: (inaudible)

THE COURT: I just think it should be said that if people cry, so to speak, about the fact—if you cry, so to speak, about the fact that your sentence might be heavier than the others, the fact that their sentences are lighter than yours is partly because you would not testify against them. Am I being clear? I do not ask you to agree with me, but you understand—

THE DEFENDANT: The reason why I don't testify because—

THE COURT: Pardon?

THE DEFENDANT: (inaudible) me to testify then, I want—I want to be fair for my family and my safety. I don't want to testify on somebody and then got to worry about me and my family safety.

THE COURT: I understand you put your family first, and I recognize that. I do not ask anybody to be a martyr.

THE DEFENDANT: Yeah, I want to (inaudible)

THE COURT: But I just think it is fair to point it out, that is all I am saying to you. Anything further that you wish to say to me?

THE DEFENDANT: No, no, sir.

The State argues that the court "merely commented on the reality that, had Roary agreed to testify in another conspirator's trial, as was discussed prior to trial, he may have been able to negotiate a lesser sentence. The court did not, however, sentence Roary more harshly because he was unwilling to testify in his co-conspirators' trials." According to the State's brief, the discussion arose because the trial court had "repeatedly expressed its concern about the State's sentencing recommendation in light of the fifteen-year sentences being served by Shepherd and Peters, and also inquired about [the

judge who sentenced Shepherd and Peters] motivation for the 15–year sentences." After noting the "apparent facial injustices of the State's requesting 58 years for Roary when Shepherd and Peters were serving 15 years," the court stated:

"I concede these various motives that this gentleman, Mr. Roary, may have had in the course of his various statements. But one thing is clear: no one would deny that he made it very clear what happened from the get-go, as they say. Having spoken, he now finds that the two killers are set free, so to speak, and he is hoisted on his own, as they say in another language, his own petard. It is an expression. It is an expression meaning that the two killers say nothing and get 25 years—15 years, excuse me—and the non-killer speaks the truth and the State seeks 58 years."

(State's brief at 29 (citing T. 9/23/03 at 31–32)).[19] The State further notes that the sentence Roary received was within the sentencing guidelines and less than the sentence requested by the State.[20] The State concludes by noting that the court took "great care in fashioning Roary's sentence." We agree.

Following the above colloquy, the court took a recess to consider the appropriate sentence. When the court returned it stated:

All right, I have reached a decision in this case. It is an attempt on my part to reconcile the conflicting elements of this sentencing, one of the more difficult sentences this court has had, trying to respect the memory of this decedent and the pain and turmoil of the family that has been

---

**19.** We cite from the State's brief because a complete copy of the transcript from the sentencing hearing, dated September 23, 2003, although referenced by both the State and Roary, is not included in the record.

**20.** The sentencing guidelines for Roary's case were 20 to 30 years for second-degree felony-murder, 8 to 15 years for conspiracy to commit first-degree assault, and 1 to 5 years for the handgun charge. In consideration of the victim's family's wishes, the State had sought 30 years for the murder conviction, 25 consecutive years for the conspiracy conviction, and 3 years consecutive on the handgun conviction.

caused by this incredible killing. And at the same time, respect the fact that every defendant has to be looked at individually and every case has to be looked at individually.

The court then discussed the impact that the crime has had on the victim's family, the information contained in the PSI report, and Roary's involvement in the crime. The court stated:

> What is the truth in this case is that this Defendant, Roary, is not the killer and cannot be, in the conscience of this court, this judge, sentenced as if he was the killer when he was not. That makes the law topsy-turvey and it makes the law disrespected by the court, and I am not going to do that. On the other hand, I also see this Defendant as very culpable. I have made clear my views on the role that you played, Mr. Roary, in this case. I know you have danced around it.

> But I have no question in my own mind that you were a full participant in the assault on this gentleman, on the victim, for some irrational, stupid street reason known to you and to few others, I suspect, acting like—well, acting like you acted is the best way to put it, to chase a man down. Three or four people chasing one person down shows four cowards.

> \* \* \* \*

> You have, I think, been as truthful as a person in your circumstances can be, and far more truthful frankly than the defendants that Mr. Yee or Mr. Cardin most often see in these courtrooms. I think that has to be taken into account by me in this sentence. I cannot sentence you as requested by the victim's family because I think it would be unjust and it would defy the law, and it would defy the reality of this case. But I do think you need to be punished severely because the other defendants were less treated, shall we say—well, less treated by the court system does not warrant everybody else being treated less severely. That does not make sense either. So finding the balance

here is not easily done. But the court will do the best it can since we are all human.

The judge then sentenced Roary to a total of 35 years.[21]

■ Although we arrive at a different conclusion than the court in *Johnson*, 274 Md. 536, 336 A.2d 113, we find the case instructive. The issue in *Johnson* was whether the sentencing court had denied Johnson due process by sentencing him to a longer term based upon Johnson's election to stand trial instead of pleading guilty. *Johnson*, 274 Md. at 537 n. 5, 336 A.2d at 114. The Court acknowledged a trial court's broad discretion in fashioning an appropriate sentence but noted that "in order to protect the fundamental rights of the offender" there are certain restrictions on the court's latitude. *Johnson*, 274 Md. at 542, 336 A.2d at 116–117. The trial court may not, for instance, take into consideration a criminal defendant's choice to exercise his right to require the State to prove at trial his guilt beyond a reasonable doubt, or the rights embodied in Amendments V and VI of the United States Constitution and Articles 21 and 22 of the Maryland Declaration of Rights. *Johnson*, 274 Md. at 543, 336 A.2d at 117 and n. 5. The dialog in question in *Johnson* occurred during the allocution and immediately before the court issued its ruling. Specifically, the court stated:

> If you had come in here after this happened, before the other trouble you got into—if you had come in here with a plea of guilty and been honest about (it) and said, "Of course I did it," which you did, you would probably have gotten a modest sentence, . . . and you would have gotten out of it. But with this attitude that you have you can't receive that kind of treatment.
>
> The sentence of the court is that you be confined under the jurisdiction of the Department of Correctional Services for a period of twelve years, to run concurrent with the sentence

---

21. As previously noted, Roary received a sentence of 30 years on the second-degree felony-murder charge, five years consecutive on the conspiracy charge, and three years concurrent on the handgun offense.

that you are serving in the District of Columbia. Very well, that's all.

*Johnson,* 274 Md. at 539–40, 336 A.2d at 115.

We concluded in *Johnson:*

In the case now before us, when Judge Powers said "if you had come in here with a plea of guilty ... you would probably have gotten a modest sentence," he indicated that he, at least to some degree, punished Johnson more severely because he failed to plead guilty and, instead, stood trial. Although a reading of the judge's remarks in full does not necessarily demonstrate that a more severe sentence was imposed, the words just quoted manifest that an impermissible consideration may well have been employed. Any doubt in this regard must be resolved in favor of the defendant.

*Johnson,* 274 Md. at 543, 336 A.2d at 117.

This case is unlike the sentencing court in *Johnson* which stated that the defendant was not going to receive the "modest" sentence he probably would have had he acknowledged his guilt by pleading guilty, because of his "attitude," which in context clearly referred to his refusal to acknowledge his guilt through a guilty plea. The court in the case at bar clearly articulated the basis for its decision, leaving no doubt regarding the factors considered by the court. The court cited the impact the crime has had on the victim's family, the heinous nature of the crime, Roary's personal history, and the extent of Roary's involvement in the crime, as its reasons for sentencing Roary as it did. Based on our review of the record, we conclude that the trial court properly exercised its discretion in sentencing Roary and did not penalize him for refusing to testify against his co-conspirators.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

BELL, C.J., RAKER and WILNER, JJ., Dissent.

RAKER, Judge, with whom BELL, C.J. and WILNER, J., join, dissenting:

A first degree assault that results in death cannot, and should not, serve as an underlying felony for purposes of the felony-murder rule. The Court holds that first degree assault would support a common law second degree felony-murder conviction if the nature of the crime itself or the manner in which it was perpetrated was dangerous to human life. Maj. op. at 230. I disagree. In my view, the felony must be one that is independent of the homicide, and thus necessarily independent of the assault which merges therein, such as rape, burglary, arson, robbery or child abuse. Accordingly, I respectfully dissent.

## I. Felony–Murder

Undoubtedly, the felony-murder doctrine is part of Maryland jurisprudence, both as a matter of common law and by statute. *See Fisher v. State,* 367 Md. 218, 247–51, 786 A.2d 706, 724–26 (2001); Md.Code (2002, 2004 Cum. Supp.), § 2–201(a)(4) of the Criminal Law Article (originally enacted by 1809 Md. Laws, Chap. 138, § 3). It has been justified in Maryland most recently in *Fisher* as a deterrent to dangerous conduct. 367 Md. at 262, 786 A.2d at 732 (stating that "The modern version of the rule is intended to deter dangerous conduct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill").[1] The felony-murder doctrine has been described as "a highly artificial concept that deserves no extension beyond its required application." *People v. Phillips,* 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353,

---

1. The felony-murder doctrine has been criticized by some courts and commentators as " 'an anachronistic remnant' that operates 'fictitiously' to broaden unacceptably the scope of murder. The very concept of transferred intent has been criticized as having 'no proper place in criminal law.' " Nelson E. Roth and Scott E. Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads,* 70 Cornell L. Rev. 446, 453–54 (1985).

360 (1966), *overruled on other grounds by People v. Flood,* 18 Cal.4th 470, 76 Cal.Rptr.2d 180, 957 P.2d 869, 882 n. 12 (1998).

Today the Court extends the application of the felony-murder doctrine, contrary to the trend around the country. While most states have maintained the doctrine, they have limited its application.[2] *See, e.g., Commonwealth v. Matchett,* 386 Mass. 492, 436 N.E.2d 400, 407–08 n. 12 (1982) (citing cases and statutes); *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550, 555 (1970) (observing that "we do want to make clear how shaky are the basic premises on which [the felony-murder rule] rests. With so weak a foundation, it behooves us not to extend it further and indeed, to restrain it within the bounds it has always known"); *see also* Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* 70 (3d ed. 1982) (stating that the rule is "somewhat in disfavor at the present time" and that "courts apply it where the law requires, but they do so grudgingly and tend to restrict its application where circumstances permit"). In light of the history of the rule, and the modern trend and approach to criminal law, I cannot fathom extending this rule.

A common limitation of the application of the felony-murder doctrine is the so-called "merger doctrine." The merger doctrine, first conceived in the nineteenth century, bars the application of the felony-murder doctrine whenever the underlying felony is an integral element of the homicide. Under the merger doctrine, the underlying felony must be independent of the homicide. *See Barnett v. State,* 783 So.2d 927, 930 (Ala.Crim.App.2000); *State v. Essman,* 98 Ariz. 228, 403 P.2d 540, 545 (1965) (en banc); *State v. Strauch,* 239 Kan. 203, 718 P.2d 613, 625 (1986); *State v. Clark,* 204 Kan. 38, 460 P.2d 586,

---

**2.** Some common limitations are that the underlying felony must be one which is inherently dangerous to human life, that there must a coincidence of time and place (the homicide must occur during the commission of a felony or closely connected thereto by a causal relation), or that the commission of the felony must be the proximate cause of the homicide. *See, e.g., Metheny v. State,* 359 Md. 576, 629–30, 755 A.2d 1088, 1117–18 (2000); *Stebbing v. State,* 299 Md. 331, 353–54, 473 A.2d 903, 913–14 (1984). *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.5 (2d ed. 2003).

590 (1969); *State v. Shock,* 68 Mo. 552, 562 (Mo.1878); *State v. Hanes,* 729 S.W.2d 612, 617 (Mo.Ct.App.1987); *People v. Moran,* 246 N.Y. 100, 158 N.E. 35, 36 (1927); *Sullinger v. State,* 675 P.2d 472, 473 (Okla.Crim.App.1984).

Chief Judge Cardozo's discussion in *Moran* of the necessity for an independent underlying felony often has been cited and quoted in the New York Court of Appeals and other state courts' discussions of the merger doctrine. Moran was convicted of murdering a police officer. The only theory presented to the jury for the murder charge was felony-murder. *Id.* at 36. In reversing, the court held that the felonious assault resulting in the death could not be the underlying felony for felony murder. The court stated:

> "Homicide is murder in the first degree when perpetrated with a deliberate and premeditated design to kill, or, without such design, while engaged in the commission of a felony. To make the quality of the intent indifferent, it is not enough to show that the homicide was felonious, or that there was a felonious assault which culminated in homicide. Such a holding would mean that every homicide, not justifiable or excusable, would occur in the commission of a felony, with the result that intent to kill and deliberation and premeditation would never be essential. The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape."

*People v. Moran,* 158 N.E. at 36 (citations omitted).

The Supreme Court of California addressed the issue of whether assault with a deadly weapon could serve as the predicate felony for a felony-murder conviction in *People v. Ireland,* 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969) (en banc). Ireland was charged with shooting and killing his wife. *Id.* at 582–83. Applying the "merger doctrine" and requiring an independent felony, the court stated:

> "We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule 'beyond any rational function that it is

designed to serve.' To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged."

*Id.* at 590 (citation omitted).

Courts have been concerned that the use of felonious assault as a predicate for felony-murder, either in the first or second degree, would result in an obliteration of the different grades of homicide. Along with New York and California, Kansas also expressed this concern. In *State v. Fisher*, 120 Kan. 226, 243 P. 291 (1926), the Kansas Supreme Court rejected assault with a deadly weapon as a basis for a felony-murder conviction and embraced the merger rule, stating:

"This contention cannot be sustained. The effect of it would be to make any homicide, not excusable or justified, which by our statute, is defined to be manslaughter in any of the degrees or murder in the second degree, to constitute murder in the first degree. In other words, there could, under this interpretation of the statute, be no such thing as any lower degree of homicide than murder in the first degree."

243 P. at 293; *see also State v. Branch*, 244 Or. 97, 415 P.2d 766, 767 (1966) (en banc) (observing that in order to preserve the distinctions between degrees of murder and manslaughter, courts have held that assault merges with the killing and cannot be the predicate for felony-murder). Under this reasoning, in Maryland, without the merger doctrine, all murder would at least be second degree murder.

In the years since *Moran*; *Fisher*; *Branch*, and *Ireland*, most states considering this issue have adopted some version of the merger rule for first degree assaults resulting in the death of the victim. *See Sullinger*, 675 P.2d at 473 (noting that "The mainstream of cases hold that the felony murder doctrine is not applicable where felonious assault results in death, reasoning that the assault merges into the homicide"); *Garrett v. State*, 573 S.W.2d 543, 545 (Tex.Crim.App.1978) (noting that applying the felony murder rule in such instances "has been rejected in the vast majority of jurisdictions throughout the United States where it is held that a felonious assault resulting in death cannot be used as the felony which permits application of the felony murder rule to the resulting homicide"). *See generally* Robert L. Simpson, Annotation, *Application of Felony–Murder Doctrine Where the Felony Relied Upon is an Includible Offense with the Homicide,* 40 A.L.R.3d 1341 (2004).

The restriction of the application of the felony-murder doctrine to felonies independent of the homicide does not make irrelevant that a death may have occurred during the course of a first degree assault. In Maryland, as in many other jurisdictions, second degree murder may be established by four modalities: (1) specific intent-to-kill murder, (2) intent-to-do-serious-bodily-injury murder, (3) depraved-heart murder, and (4) felony-murder. In my view, in many if not all of the circumstances, the commission of a first degree assault, of the dangerous to life variety, particularly one involving violence or the use of force, will indicate (1) an intention to kill, (2) an intention to cause great bodily harm, or (3) wanton or willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm (depraved-heart murder). In those circumstances, felony-murder is not necessary to establish the requisite *mens rea* for murder. As the court noted in *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304, 320 (1980), "It is, therefore, not necessary for the law to imply or for the jury to infer the intention to kill once the finder of fact determines the existence of any of the other three mental states because each one, by itself,

constitutes the element of malice aforethought." *Cf. Harrison v. State*, 382 Md. 477, 508, 855 A.2d 1220, 1238 (2004) (noting that there is little utility in extending the doctrine of transferred intent to inchoate crimes, and rejecting the doctrine of transferred intent under those circumstances because "it is not necessary to make a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim, the purpose for which it was conceived") (citation omitted).

Finally, the purported underlying purpose of the felony-murder doctrine, that of deterrence, is not furthered by permitting first degree assault to serve as a predicate felony. *Fisher* makes clear that the primary purpose of the modern felony-murder rule is to deter dangerous conduct. *Fisher*, 367 Md. at 262, 786 A.2d at 732. The deterrence purpose underlying the rule has been described as follows by one commentator:

> "The primary justification offered for the contemporary felony-murder rule is deterrence. The doctrine is allegedly designed to save lives by threatening potential killers with the serious sanction for first or second degree murder. One deterrent argument holds that the threat of a murder conviction for any killing in furtherance of a felony, even an accidental killing, might well induce a felon to forego committing the felony itself. Because it could lead to quite severe punishment, the risk averse might shy away from the entire felonious enterprise. Another argument, the more prevalent of the two main deterrent explanations of felony-murder, maintains that the rule is aimed at discouraging certain conduct during the felony, not the felony itself. The goal is to encourage greater care in the performance of felonious acts. Such care will lower the risks to human life and result in fewer deaths. Still another view suggests that felons who might kill intentionally in order to complete their felonies successfully will be discouraged by the rule's proclamation that the law will entertain no excuses for the homicide. Calculating felons will forego killing because of their awareness that the chance of constructing a defense that

would eliminate or mitigate liability is virtually nonexistent and that, therefore, their likely fate is a murder conviction." James J. Tomkovicz, *The Endurance of the Felony–Murder Rule: A Study of the Forces that Shape Our Criminal Law,* 51 Wash & Lee L. Rev. 1429 (1994). If indeed the purpose of the felony-murder rule is to deter accidental or negligent killings, how then is the purpose furthered by finding murder when the defendant intentionally commits a dangerous and life threatening assault? Moreover, how is the purpose furthered when the rule is applied, as it must be under Maryland law, to an accomplice who may not have inflicted the harm personally, had no knowledge that the ultimate perpetrator had a deadly weapon, and had no intent to commit murder?

The application of the felony-murder rule and the extension of the doctrine to the case *sub judice* is particularly disturbing. Roary was charged with murder; the trial court granted Roary's motion for judgment of acquittal on first degree murder and sent second degree to the jury. The court instructed the jury that "second-degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that would be the likely result." The court separately instructed the jury as to second-degree felony murder and submitted a verdict sheet to the jury, requesting verdicts on the charge of second degree murder, second degree felony-murder, involuntary manslaughter by gross negligent conduct, and involuntary manslaughter by unlawful act. The jury returned a verdict of not guilt as to second degree murder, but guilty as to felony-murder and both counts of involuntary murder. Roary was sentenced to 30 years for felony-murder and five years consecutive for conspiracy. This jury found that Roary did not intend to kill the victim, nor did he intend to inflict grievous bodily harm upon him. It is only by the application, and the extension thereof, of the felony-murder doctrine that Roary was convicted of murder.[3]

---

**3.** The matter is further complicated by the fact that Roary's liability and accountability for these crimes is in large part based upon accomplice

## II.  Preservation

I would reject the State's argument that the issue of whether first degree assault may be a predicate for felony-murder was not preserved for appellate review because the issue is one of jurisdiction, and as such, may be raised at any time. Where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction. *Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277, 1279 (1985) (citing *Pulley v. State*, 287 Md. 406, 415–16, 412 A.2d 1244, 1249 (1980); *Urciolo v. State*, 272 Md. 607, 616, 325 A.2d 878, 884 (1974)). "Thus, any action taken by a court while it lacks 'fundamental jurisdiction' is a nullity, for to act without such jurisdiction is not to act at all." *Pulley*, 287 Md. at 416, 412 A.2d at 1249 (citing *Fisher, Admrx. v. Demarr*, 226 Md. 509, 515, 174 A.2d 345, 348 (1961); *Fooks' Executor v. Ghingher*, 172 Md. 612, 619, 192 A. 782, 785 (1937); *Wickes v. Caulk*, 5 H. & J. 36, 42 (1820)). The court has no power in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense. *Robinson v. State*, 353 Md. 683, 702, 728 A.2d 698, 707 (1999) (quoting *Williams*, 302 Md. at 792, 490 A.2d at 1279 as stating "Manifestly, where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense"); *see Urciolo*, 272 Md. at 616, 325 A.2d at 884.

In the instant case, because first degree assault may not serve as a predicate for felony-murder under the merger doctrine, Roary was not convicted of an offense within the jurisdiction of the Circuit Court.  His sentence was illegal and the issue may be raised and attacked at any time.

The issue of preservation in similar circumstances arose recently in *Lane v. State*, 348 Md. 272, 703 A.2d 180 (1997). We found the matter to be appealable, reasoning as follows:

---

liability inasmuch as Roary was not the person who threw the rock or struck the fatal blow.

"Ordinarily, we would not address an issue not raised in or expressly decided by the trial court. It has long been the law, however, which is now articulated in Maryland Rule 8–131(a), that a challenge to the trial court's subject matter jurisdiction may be raised on appeal even if not raised in or decided by the trial court. This exception to the general rule of preservation is based on the premise that a judgment entered on a matter over which the court had no subject matter jurisdiction is a nullity and, when the jurisdictional deficiency comes to light in either an appeal or a collateral attack on the judgment, ought to be declared so.

"In this regard, it has now become recognized that a court may not validly enter a conviction on a charge that does not constitute a crime and that the deficiency in any such judgment is jurisdictional in nature. In *Williams v. State,* 302 Md. 787, 791–92, 490 A.2d 1277, 1279 (1985), we declared it 'fundamental that a court is without power to render a verdict or impose a sentence under a charging document which does not charge an offense within its jurisdiction prescribed by common law or by statute' and that 'where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense.' The argument that attempted rape by a husband of his wife is not a crime goes to the jurisdictional sufficiency of that part of the indictment and therefore of the conviction, and, accordingly, it is an argument that is properly before us."

*Id.* at 278–79, 703 A.2d at 183–84 (citations omitted).

In *Barnett v. State,* 783 So.2d 927 (Ala.Crim.App.2000), the defendant raised the merger doctrine, arguing that he could not be convicted of felony-murder where the underlying felony was first degree assault. The State argued lack of preservation. The court held that the issue was jurisdictional and could be considered by the court, even if the issue was not raised by the defendant. *Id.* at 928–29.

If felony-murder may not be predicated upon the felony of first degree assault, then the sentence is illegal. *See Fisher v. State,* 367 Md. 218, 240, 786 A.2d 706, 719 (2001) (holding that "if the felony murder doctrine has no application to a homicide resulting from child abuse, then the thirty year sentences for murder in the second degree imposed on the petitioners would be similarly illegal, because, by the special jury verdict, the findings of guilty of murder were based solely on felony murder"). An illegal sentence may be challenged at any time. *Id.* at 239–40, 786 A.2d at 719 (quoting *Moosavi v. State,* 355 Md. 651, 662, 736 A.2d 285, 291 (1999)).

In my view, the issue raised is jurisdictional, which can be raised at any time, and is properly before this Court.

Chief Judge BELL and Judge WILNER authorize me to state that they join in this dissenting opinion.